Gaston, J.
 

 The late John Rex, of the City of Raleigh, by his will duly executed, after devising to his nephew, John Rex, of Montgomery County, Pennsylvania, a tract of land, situate in that county, devised all his real estate in the State of North Carolina unto Duncan Cameron and Geoorge W. Mordecai and the survivor of them, upon certain trusts therein afterwards particularly declared. He then bequeathed unto the said Duncan Cameron and George W. Mordecai and the survivor .of them all his slaves, in trust to cause the said slaves, as soon after the testator’s death as practicable, to be removed to Africa, and there settled in some colony, under the patronage and control of the American Colonization Society; with a proviso, that in case any of the said slaves should refuse to be so removed, the slave so refusing should be sold and the money, arising from the sale, should be added to the fund created for the removal and support of such of the slaves, as should be removed to Africa with their consent. The testator proceeded to declare his will as follows: “It is my will and desire that the lands and plantation, about three miles west of Raleigh, and the several lots of land, comprising my tan yard establishment, together with all my crop, stock of every kind, plantation tools and carriages, implements for tanning and currying, household and kitchen furniture, belonging to me at the time of my death, be sold by the said Duncan Cameron and George W. Mordecai, or the survivor of them — and the proceeds of such sale shall constitute a fund to defray the .expenses incidental to the removal of my slaves to some colony in Africa, under the patronage and control of the American Colonization Society, and for the establishment of said slaves in such colony after their removal to the same.” The testator then gave to the same devisees and the survivor of them, all the money belonging
 
 *438
 
 him, all the debts due to him, and all the residue of his nol: t'nere^n devised and appropriated, in trust to and for the erection and endowment of an infirmary or hospital for thg sjcic anc[ afflicted poor of the City of Raleigh, upon a , *
 
 J
 
 53
 
 1
 
 r lot of twenty acres adjoining the said city, which he thereby appropriated to that purpose — and directed that when the constituted authorities of the city should appoint trustees, capable in law of holding the same, then his said devisees or the survivor of them should convey the said lot of twenty acres and the fund accruing from the money belonging to him, the debts due to him, and the residue of his estate, as above described, unto the said trustees, so to be appointed, in trust for the erection and endowment of such hospital. And the testator further constituted the said Duncan Cameron and George W. Mordecai Executors of his will. The testator died, the executors proved the will, entered immediately upon the performance of the trusts thereby imposed, and caused all the said slaves, with the exception; of a negro woman Winney, who would not consent to leave the state, to be removed to the Colony of Liberia in Africa, a colony under the control and patronage of the American Colonization Society, where they are now residing as free persons. The constituted authorities of the City of Raleigh, have appointed trustees, capable in law of holding the property appropriated for the erection and endowment of the hospital, and the Legislature to enable the said trustees more efficiently to execute the trust reposed in them, have, by a special act, constituted them and their successors a body corporate and politic by the name of “ The Trustees of the Rex Hospital Fund.” This bill is filed by the plaintiffs, the said Cameron and Mordecai, for the advise of the court upon certain questions of alleged difficulty in the construction of the will, and also that they may have a settlement of their accounts, under the direction of the court, and to it are made parties defendants the commissioners of Raleigh, the said trustees, and the negroes so removed to Africa. The commissioners and trustees have answered the bill. The negroes not being in the state, were made parties by publication, and as to them the bill was taken
 
 fro confesso.
 
 A partial decree has been
 
 *439
 
 made, and nothing now remains for the action of the court; except the questions upon which their advise has been prayed.
 

 The first question is, whether a stock of leather, which the , .... . ,_. , , ... testator had in his tanning establishment at the time oí death, constitutes a portion of the fund, appropriated for the removal of his slaves to Africa and their establishment there, or falls into the other fund, provided for the erection and endowment of the hospital. Upon this question we are of opinion that the stock of leather does constitute a part of the first fund, and does not fall into the second. Stock, as meaning a personal capital, set apart for use or profitable employment, is confessedly of various kinds — such as agricultural, mercantile, manufacturing, or vested in public or corporate funds. The expression used here is ‘‘stock of every kind,”1 and it is used in the same sentence, in which the testator disposes of his plantation and his tanning-establishment. No reason can be discovered, why terms so broad, used in this connection, can be restrained to stock belonging to the plantation, and exclude stock, belonging to the tannery. No argument in favour
 
 of
 
 such a construction can arise from the testator having expressly named his implements for tanning, because, in the same sentence, he has named also his plantation tools. We are not at liberty to look out of the will for its meaning; and, if we were, we cannot hold, that the greater or less amount of this stock ought to affect the interpretation of the will.
 

 The negro woman Winney, who refused to go to Liberia^ had been purchased by the testator upon a credit, and the price was unpaid at his death. The executors rescinded the contract with the seller, returned the slave and took in the testator’s note. And it is askéd of us whether the amount of this note .ought not to fall into the first fund. We answer this question in the affirmative, - The debt, which the testator owed for the purchase of Witney, was chargeable on the
 
 residuary
 
 part of the estate, given to the hospital fund — and the value of Winney, if she refused to be removed, belonged to the colonization fund. She did refuse — and the transae
 
 *440
 
 tion was substantially a re sale, and the produce of such re~ sale must appropriated as the testator has directed.
 

 The remaining question arising upon the pleadings is, whether the whole of the fund appropriated
 
 to the
 
 removal . rr. 1 and settlement
 
 of these negroes is given
 
 for the beneficial use
 
 of the
 
 removed negroes, to be applied to their support and advancement and as their property, or whether it is only subject to a charge for their removal to Africa and the first necessary expenses, incidental to their settlement in a new country, and after satisfying these expenses, does not fall into and pass with the general residue. In the answer of the Commissioners of Raleigh it is insisted, that the testator only charged his estate with the expenses of removal and settlement, and that the whole sum remaining in the hands of the plaintiffs, after defraying such expenses, falls into the Hospital Fund. Two grounds are taken in support of this claim. The first for that the negroes, at the time of the testasor’s death, were-slaves, and incapable of taking property, that a .trust for them or for their emancipation was illegal and void, and therefore results to those who would have been entitled, if no such disposition had been attempted. It is true, that as slaves at the death of the testator, they were .incapable of taking a beneficial interest under the will, and that this bequest cannot be upheld, except on the ground of a devise or gift to a charitable purpose. The validity of a disposition of property, either by deed or will, to “charitable purposes” is acknowledged by our act of 1832, ch. 4, reenacted in chapter IS, of the Revised Statutes, by which provision is made for compelling the executors or trustees of a charitable fund to account
 
 therefor.
 
 No definition is given in the statute of charitable purposes, but we see no cause to doubt that liberation from slavery, when not forbidden by law or inconsistent with public policy, is a purpose of this kind. Our law and our policy alike forbid the manumission of slaves to reside amongst us, but they never did forbid the removal of them to a free dountry in order to their residence there as free people. Indeed, in the act of 1830, ch. 9, — see chapter 101 of the Revised statutes — it is the declared policy of this State to promote and encourage their emancipation.
 
 *441
 
 so that they be but removed and kept removed without the State. As a fund, therefore, devoted to a charitable purpose, not inconsistent but in accordance with public policy — and applicable within a reasonable period after the testator’s death — we see no valid objections to the appropriation. The second ground, taken in support of the claim in the answer, is, that the whole fund is not appropriated to the purpose of removal and settlement, but only so much as is
 
 necessary
 
 for those purposes. We are clearly of a different opinion. The testator has expressly directed the whole fund to be so applied, and there is no reason to restrain such application. “Settlement,” implies, where the fund is sufficient, comfortable settlement, and there can be no question but that the whole of the fund may be expended without going beyond such a provision. The objects oí the Testator’s bounty are now free and capable of using, enjoying and applying, what may remain of the fund, appropriated for their settlement in-Liberia.
 

 Per Curiam, Decree accordingly.